WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Masiello,<br><br>          Plaintiff,<br><br>v.<br><br>Realty Executives LLC,<br><br>          Defendant. | No. CV-24-00045-PHX-DLR<br><br>**ORDER** |

Before the Court is Defendant Realty Executives, LLC's motion to dismiss the amended class action complaint. (Doc. 91.) The motion is fully briefed, and the Court heard oral argument on October 21, 2025. (Docs. 94, 100, 104.) For the following reasons, the motion is granted.

**I.     Background**

Until recently, the National Association of Realtors ("NAR") and its local chapters had a longstanding "Buyer-Broker Commission Rule" ("the Rule"), which effectively required home sellers to offer a percentage of their home's sale price as commission for the broker representing the buyer. (Doc. 85 at ¶¶ 1–3, 42.) If sellers did not comply with the Rule, they would lose access to Multiple Listing Services (MLSs), databases where virtually all homes in Arizona are sold. (*Id.* at ¶ 3.)

In 2021, Plaintiff Joseph Masiello sold his home on an Arizona MLS through HomeSmart Holdings Inc, a large brokerage. (*Id.* at ¶ 18.) Mr. Masiello paid a 2%

commission ($8,200) to the seller broker and a 2.5% commission ($10,250) to the buyer broker. (*Id.*)

Mr. Masiello filed a class action complaint against more than a dozen real estate brokers and local NAR chapters, alleging that an agreement to implement the Rule was an anticompetitive conspiracy in violation of federal and state antitrust laws, 15 U.S.C. § 1 and A.R.S. § 44-1402. (Doc. 1 at ¶¶ 5–6.) Mr. Masiello alleges that several realty groups, including Realty Executives, encouraged brokers and other affiliates to become members of the NAR or its local chapters, served in leadership roles in the local NAR chapters, and otherwise implemented the Rule "in the day-to-day transactions involving home sales in Arizona." (Doc. 85 at ¶ 6.)

Various Defendants, including HomeSmart, subsequently resolved their potential liability through a nationwide NAR settlement and other settlements, leaving only two Defendants named in the amended complaint: brokers Realty Executives and My Home Group Real Estate, LLC. (*Id.* at ¶ 22.) The Court granted a stay to My Home Group pending final approval of a settlement in the Western District of Missouri. (Doc. 98.) Realty Executives, meanwhile, moved to dismiss for lack of Article III standing and antitrust standing. (Doc. 91 at 3, 5.) As explained below, the Court agrees that Mr. Masiello lacks Article III standing to complain about Realty Executives' alleged anticompetitive conduct, so the Court does not reach the antitrust standing issue.

**II.     Legal Standard**

Under Article III of the Constitution, federal courts may adjudicate only "cases" or "controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010) (quotation omitted). Article III standing requires a plaintiff to show: (1) an "injury in fact," (2) that is "fairly traceable" to the defendant, and (3) a likelihood that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citations and quotations omitted). "If none of the named plaintiffs purporting to represent a class establishes the requisite of a case or

controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

### III. Discussion

As a preliminary matter, Mr. Masiello alleges an injury in fact. Using data from comparable international real estate markets, Mr. Masiello claims that an American home seller should pay a commission fee of 3% or less in a competitive market. (Doc. 85 at ¶¶ 59–60.) However, Mr. Masiello paid 4.5% in commission when he sold his home, totaling $18,450. (*Id.* at ¶ 18.) Accepting these allegations as true, Mr. Masiello paid about 1.5% more in commission than he should have paid in a competitive market, totaling approximately $6,150.

The dispute here is about traceability. Mr. Masiello does not allege that he transacted with Realty Executives. He instead transacted with HomeSmart and an unnamed buyer broker. (*Id.*) Nonetheless, Mr. Masiello argues that his injury is fairly traceable to Realty Executives' conduct because Realty Executives participated in a conspiracy that harm him. (*See* Doc. 94 at 4–5.)

Generally, "a plaintiff who has no cause of action against the defendant can not fairly and adequately protect the interests of those who do have such causes of action. This is true even though the plaintiff may have suffered an identical injury at the hands of a party other than the defendant." *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973) (internal quotations omitted). However, "this position does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury." *Id.* "[T]he action of any of the conspirators to restrain or monopolize trade is, in law, the action of all." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). Essentially, "[b]ecause antitrust liability is joint and several, a Plaintiff injured by one Defendant as a result of the conspiracy has standing to represent a class of individuals injured by any of the Defendant's co-conspirators." *See In re NASDAQ Mkt.-Makers Antitrust Litig.,* 169 F.R.D. 493, 508 (S.D.N.Y. 1996).

When a conspiracy claim is necessary to the plaintiff's theory of traceability, the plaintiff must properly allege the conspiracy. After all, if a defendant did not plausibly participate in a conspiracy that harmed the plaintiff, then the plaintiff's injury cannot plausibly be traced to defendant's conduct. It therefore is proper for the Court to consider whether Mr. Masiello has plausibly alleged that Realty Executives participated in a conspiracy because doing so is necessary to resolve the issue of traceability.

An antitrust conspiracy is a tacit or express agreement to illegally restrain trade. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). A plaintiff alleging conspiracy must plead "allegations plausibly suggesting (not merely consistent with) agreement." *Id.* at 545. "[M]ere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim under § 1 [of the Sherman Antitrust Act]. Plaintiffs must plead something more, some further factual enhancement, a further circumstance pointing toward a meeting of the minds of the alleged conspirators." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (citation and quotations omitted). Facts pointing toward a conspiracy may include direct allegations of an agreement or circumstantial "plus factors" that make it plausible to infer the existence of a conspiracy. *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015). "Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments*, 798 F.3d at 1194.

Courts often conceptualize complex conspiracies as wheels. A "hub-and-spoke" conspiracy consists of "both vertical agreements between the hub and each spoke and a horizontal agreement among the spokes to adhere to the hub's terms, often because the spokes would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing." *Apple*, 791 F.3d at 314 (quotation omitted). By contrast, a "rimless" conspiracy "is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's

involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002).

A hub-and-spoke conspiracy may be treated as a single conspiracy in which all participants are jointly and severally liable for any harm attributable to the conspiracy. *See In re Musical Instruments*, 798 F.3d at 1192 ("One conspiracy can involve both direct competitors and actors up and down the supply chain, and hence consist of both horizontal and vertical agreements."). However, "a rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants." *Dickson*, 309 F.3d at 203. Thus, Mr. Masiello's injury can fairly be traced to Realty Executives if Realty Executives participated in the same conspiracy as HomeSmart or the buyer broker that Mr. Masiello transacted with—that is, if there was a horizontal agreement between the brokers.

Here, the allegations do not plausibly suggest a horizontal conspiracy between brokers. In arguing otherwise at oral argument, Mr. Masiello cited *Relevent Sports, LLC v. United States Soccer Federation, Inc.*, where the court held that "adoption of a binding association rule designed to prevent competition is direct evidence of concerted action." 61 F.4th 299, 307–09 (2d Cir. 2023). Mr. Masiello argues that the fact that Realty Executives adopted the Rule plausibly suggests on its own that Realty Executives was in a horizontal conspiracy with other brokers who adopted the Rule. But the Court is not persuaded that this is enough to allege an anticompetitive horizontal conspiracy when there are non-conspiratorial reasons for adopting the Rule.

Mr. Masiello "fail[s] to account for conscious parallelism and the pressures of an interdependent market." *In re Musical Instruments*, 798 F.3d at 1195. "[V]ertical agreements, lawful in the abstract, can in context be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel, particularly where multiple competitors sign vertical agreements that would be against their own interests were they acting independently[.]" *Apple,* 791 F.3d at 319–20 (internal quotations and citations omitted). But to account for conscious parallelism, a plaintiff generally must allege that

"individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *In re Musical Instruments*, 798 F.3d at 1195; s*ee also Twombly*, 550 U.S. at 566–67 (finding that "there was just no need for joint encouragement" to engage in allegedly anticompetitive conduct when each competitor had an independent reason for wanting to engage in the conduct). Nothing in the amended complaint suggests that it would be perilously unreasonable for one broker to independently adopt the Rule.

*In re Insurance Brokerage Antitrust Litigation* is instructive here. 618 F.3d 300 (3d Cir. 2010). There, commercial insurance purchasers sued insurers and insurance brokers for entering formal "strategic partnerships," wherein the brokers funneled clients to certain insurers and insulated them from competition. *See id.* at 308, 312. In exchange, the insurers paid the brokers contingent commission payments, which led to higher premiums for purchasers. *See id.* The plaintiffs alleged that this was a hub-and-spoke conspiracy with the brokers as the hub and the insurers as spokes in horizontal agreement. *See id.* at 327.

However, this was a rimless wheel conspiracy. *See id.* at 335–36. First, the existence of the vertical agreements alone did not plausibly suggest a horizontal conspiracy between the insurers. *Id.* at 327. Furthermore, although charging higher prices was theoretically against the insurers' competitive interests, the insurers had sufficient market incentive to enter agreements with the brokers because the brokers controlled the market. *Id.* at 327–28. The court wrote:

> [T]he defendant brokers decided to consolidate the pool of insurers to which they referred business in order to improve efficiency and extract higher commissions from each of their insurer-partners. As defendants point out, "[o]nce a broker decided to organize its business in this fashion, each insurer had sound, independent business reasons to pay contingent commissions to become and remain a 'preferred insurer.' Paying such commissions helped the insurer to compete for and retain a larger share of its partners' business than if it had no such vertical relationships." In short, the obvious explanation for each insurer's decision to enter into a contingent commission agreement with a broker that was consolidating its pool of insurers was that each insurer independently calculated that it would be more profitable to be within the pool than without. The complaints themselves reinforce this conclusion with their portrait of a concentrated

>brokerage market, in which a handful of brokers controlled the majority of client business, and an unconcentrated, more competitive market of insurers vying for premium dollars. According to plaintiffs' own account, "[t]he Insurer Defendants are thus largely dependent on the Broker Defendants to assure access to business and protect their market share." ("The close bond between broker and client gives brokers tremendous influence, and often decisive control, over the placement of their clients' insurance business."). Given this economic landscape, each insurer had an obvious incentive to enter into the "strategic partnerships" offered by the defendant brokers, irrespective of the actions of its competitors.

*Id.* (citations to the record omitted).

This matter is remarkably similar. Both the brokers in *Insurance Brokerage* and the NAR dominated their respective markets and accordingly incentivized compliance with anticompetitive rules. Since at least the 1980s, the NAR has restricted access to MLSs unless brokers complied with the NAR's rules. (*See* Doc. 85 at ¶ 26). The NAR formally adopted the Rule in 1996. (*Id.* at ¶ 31). Nearly all homes are sold on MLSs, so the NAR largely controlled the real estate market. (*Id.* at ¶ 3). Mr. Masiello acknowledges that "[a]ccess to MLSs was essential for brokers to effectively serve buyers and sellers in the market." (*Id.* at ¶ 67.) So, the NAR established a longstanding market structure wherein brokers could either comply with the Rule and gain access to the critically important MLSs or reject the Rule and lose access to the MLSs.

Thus, just as the insurers in *Insurance Brokerage* had strong independent incentives to comply with the insurance brokers' requirements, each real estate broker here had an obvious incentive to agree to the Rule, irrespective of the actions of its competitors.[1] Therefore, the mere fact that the brokers all adopted the Rule does not plausibly suggest that there was a horizontal conspiracy among the brokers.

The amended complaint does not contain any other facts that might suggest a horizontal conspiracy between the brokers. It instead focuses on the separate relationships

---

[1] This market structure does not excuse the real estate brokers from their participation in the allegedly anticompetitive vertical conspiracies with the NAR and its local chapters. *See Flintkote Co. v. Lysfjord,* 246 F.2d 368, 375 (9th Cir. 1957). Rather, the market structure simply suggests that the brokers had rational incentives to comply with the Rule beyond horizontal agreements with other brokers.

between the local NAR chapters and each broker. (Doc. 85 at ¶¶ 51–55.) Thus, Mr. Masiello at most alleges a rimless wheel conspiracy. The Court must therefore treat the agreements between each broker and the local NAR chapters as separate conspiracies. Even if Realty Executives entered an anticompetitive agreement with the NAR and its local chapters, Realty Executives cannot be jointly and severally liable for the harm *other* brokers caused Mr. Masiello. This means Mr. Masiello lacks Article III standing to sue Realty Executives because his alleged injury is not fairly traceable to Realty Executives' conduct.

### IV. Leave to Amend

"The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, a "court may deny such a motion if permitting an amendment would prejudice the opposing party, produce an undue delay in the litigation, or result in futility for lack of merit." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990). Mr. Masiello does not request leave to amend in his moving documents, nor has he filed a motion for leave to amend under Local Rule 15.1(a). Moreover, at oral argument, Mr. Masiello indicated that he has no additional facts to allege beyond those found herein to be deficient. Therefore, the Court will not grant Mr. Masiello leave to amend because doing so would be futile.

### V. Conclusion

In sum, Mr. Masiello lacks Article III standing because his theory of traceability depends on alleging a horizontal conspiracy between Realty Executives and other brokers, but the amended complaint fails to do so.

**IT IS ORDERED** that Realty Executives' Motion to Dismiss (Doc. 91) is **GRANTED**. Mr. Masiello's claims against Realty Executives are **DISMISSED**.

Dated this 27th day of January, 2026.

Douglas L. Rayes
Senior United States District Judge